**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DOUGLAS A. ROSS, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 13-11089-PBS |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social | ) |
| Security Administration, | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

February 14, 2014

Saris, U.S.D.J.

**I. INTRODUCTION**

Plaintiff Douglas A. Ross seeks review of the decision denying his application for Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") benefits under 42 U.S.C. § 405(g). Plaintiff moves to reverse the Commissioner's denial of benefits, arguing that the Administrative Law Judge ("ALJ"): (1) failed to follow the treating physician rule, (2) failed to properly evaluate Plaintiff's credibility, and (3) relied on flawed vocational expert testimony. Defendant filed a motion to affirm the decision of the Commissioner.

For the reasons set forth below, the Court **DENIES** in part and **GRANTS** in part Plaintiff's Motion for Judgment on the Pleadings (Docket No. 11). The Court **GRANTS** in part and **DENIES** in

part Defendant's Motion to Affirm the Commissioner's Decision (Docket No. 17). The case is **REMANDED**.

## II. FACTS

Plaintiff was forty-six years old in July 2011 when the ALJ denied his application. He has worked as a hazardous materials technician and as an electrician, although he is not trained as a master electrician. R. 36; r. 345; r. 374. Plaintiff alleges disability beginning May 31, 2008. R. 140. On his application, Plaintiff claimed that he became ineligible to work due to his bipolar disorder, nervous disorder, post-traumatic stress disorder, torn rotator cuff, shaky hands, irregular heartbeat/tremor, cirrhosis of liver, and nearsightedness. R. 165. He also wrote in his application that he can only perform light duty work, cannot lift anything heavy, cannot handle tools due to his shaky hands, and sometimes stutters due to his medication. Id.

**A. Medical History**[1]

*1. Shoulder Injury*

---

[1] In addition to the conditions described herein, Plaintiff's medical record establishes that he suffers from a variety of other conditions, including bipolar disorder, insomnia, chronic tremor, alcohol dependence, and cirrhosis of the liver. E.g., r. 228-31; r. 281; r. 346-46; r. 357; r. 522. Because Plaintiff only asserts errors in the ALJ's assessment of evidence related to his physical, and not mental, conditions, the Court will not discuss these other conditions in detail.

Plaintiff underwent an appointment with Brian Jack, M.D.,[2] at Boston Medical Center on July 17, 2008, complaining of almost-daily left shoulder dislocations. R. 250. Ross reported that he injured his left shoulder playing basketball two months prior, and had previously sustained injuries playing other sports. Id. In a follow-up appointment with an orthopedist, Ross exhibited forward elevation to 90 degrees and abduction to 80 degrees. R. 248. A magnetic resonance imaging (MRI) scan of the shoulder conducted in late July 2008 revealed evidence of a prior anterior/inferior labral injury and a partial thickness tear of the infraspinatus, one of the four muscles of the rotator cuff. R. 244-45. Approximately two weeks later, the orthopedist administered a corticosteroid injection and referred Ross for twice-weekly physical therapy for eight weeks. R. 240. The orthopedist noted that surgical intervention could not be entertained due to Plaintiff's liver condition. Id.

In April 2009, Ross returned to Boston Medical Center's family medicine department with complaints of shoulder pain. R. 413. He reported to Avra Goldman, M.D., that he injured the

---

[2]   Dr. Jack is a professor and chair of the department of family medicine at Boston University. *Brian Jack, M.D.*, BOSTON UNIVERSITY SCHOOL OF MEDICINE: FAMILY MEDICINE, http://www.bu.edu/dbin/fammed/faculty/facultycv.php?faculty=jack (last visited Feb. 3, 2014). He is also the chief of the department of family medicine at Boston Medical Center. *Family Medicine: Our Team*, BOSTON MEDICAL CENTER, http://bmc.org/familymedicine/team.htm (last visited Feb. 3, 2014).

shoulder the day before while playing basketball, and that he had never attended physical therapy for his rotator cuff tear. Id. Dr. Goldman observed that Ross suffered from "an inability to lift arm much at all" at the appointment. Id. Dr. Goldman diagnosed him with a left rotator cuff tear and referred Ross for physical therapy. R. 416. Ross returned to Dr. Goldman in March 2010, about a year later, again complaining of pain in his left shoulder. R. 639. At that appointment, Ross told Dr. Goldman that his pain was "7/10 when using arm" and that he avoided all lifting. Id. He had not followed through with her earlier physical therapy referral, but agreed to go along with Dr. Goldman's new referral. R. 642.

On March 27, 2010, Plaintiff underwent a consultative physical examination with James Todd, M.D. R. 373. Dr. Todd noted that Plaintiff exhibited symptoms consistent with a "frozen shoulder" present for the past year. R. 374. At this appointment Plaintiff demonstrated the ability to lift forty pounds with his right hand and thirty pounds with his left, normally balanced gait, good power and strength in each hand, and an ability to manipulate fine objects. Id. A few weeks later, on April 13, 2010, Plaintiff attended a physical therapy session and reported a pain level of 7 out of 10, telling the therapist that activities such as dressing, elevating his arm, pulling, and lifting anything other than light items aggravated his pain. R.

4

440. Dr. Goldman examined Plaintiff again in June 2010. R. 425. Plaintiff reported that his left shoulder "is doing better but still not normal." Id. Plaintiff exhibited a mild tremor in his right leg, arm, and hands, with 5/5 strength in his hands. R. 427. He reported to Dr. Goldman that he was attending physical therapy, r. 425, but was discharged from physical therapy in July 2010 for failure to attend after completing only four visits, r. 449. Plaintiff's medical record includes documentation of those visits in April and May of 2010. R. 443-49.

Plaintiff saw Dr. Jack for his shoulder pain in September 2010, reporting that he continued to experience pain and loss of motion despite physical therapy and home exercises. R. 476. Dr. Jack determined that Plaintiff was unable to abduct his left arm above shoulder level, but exhibited good internal and external rotation, normal strength, and no tenderness. R. 477.

Surgeon Timothy Foster, M.D., performed an arthoscopic intervention on Plaintiff's left shoulder on December 7, 2010. R. 480-81. Dr. Foster prescribed Plaintiff oxycodone-acetaminophen "as needed for pain". R. 482. At a follow-up appointment in January, Plaintiff reported that he had slipped on ice and reinjured his left shoulder. R. 530. He complained of pain in his shoulder and "mild pain" around his spinal muscles, but radiographs showed no fracture or dislocation. Id. In January, Dr. Jack reported a "good result" from the December arthroscopy,

and reported that Plaintiff was attending physical therapy sessions. R. 531.

On April 29, 2011, Plaintiff presented to the department of orthopaedic surgery for a follow-up appointment for his shoulder condition. R. 657. He reported "minimal pain" and seemed to be "doing fairly well." Id. Although Plaintiff was engaged in home physical therapy, his orthopedist noted that she would "like to see him do more aggressive therapy" with ultrasound and modalities work to increase his range of motion. Id.

*2. Back Pain*

Plaintiff's medical record contains complaints of back pain throughout. In an April 2009 appointment, Dr. Goldman reported that Plaintiff's back pain started in early 2004 due to heavy lifting. R. 414; see also r. 426 (same notation in June 2010 appointment record). Plaintiff's back pain caused him some difficulty walking, further complicated by Plaintiff's podiatric issues, which required a bunionectomy in June 2010. R. 531; see also r. 418-19; r. 430; r. 636. On March 16, 2011, Plaintiff reported to Tony Tannoury, M.D., who is board-certified in orthopaedic surgery,[3] with a chief complaint of back pain.

---

[3] Dr. Tannoury is an assistant professor in the department of orthopaedic surgery at Boston University. *Tony Tannoury, M.D.*, BOSTON UNIVERSITY SCHOOL OF MEDICINE: ORTHOPAEDIC SURGERY, http://www.bumc.bu.edu/orthopaedics/orthopaedic-surgeon-faculty-listing/tony-tannoury-md/ (last visited Feb. 3, 2014). He is a specialist in minimally invasive spine surgery. *Id.*; *Tony Tannoury, M.D.*, BOSTON MEDICAL CENTER, ORTHOPAEDIC SURGERY,

According to Dr. Tannoury's medical record, Plaintiff "allegedly fell on black ice on [sic] February of 2011" causing him "progressive low back pain" and buttock pain, radiating down to his right leg. R. 542. Plaintiff reported that prolonged walking and standing exacerbated his symptoms. Id. He ambulated with a steady gait. R. 543. Dr. Tannoury diagnosed advanced degenerative disc disease with radiculopathy and prescribed thrice-weekly physical therapy for two months. Id.; r. 545. He also referred Plaintiff for an MRI scan, which revealed multi-level degenerative changes, a broad-based disc bulge, and bilateral neural foraminal narrowing (pinching/compressing of the nerves). R. 540-41.

## B. State-Agency Medical Consultant Evaluations

The record includes reports from state-agency medical consultants, including a Consultative Examination Report from James Todd, M.D., who is board-certified in internal medicine, r. 373, and a Physical Residual Functioning Capacity Assessment completed by Bill Straub, M.D., r. 381.[4]

---

http://www.bmc.org/orthopaedicsurgery/team-TonyTannoury-MD.htm (last visited Feb. 3, 2014).

[4] Additionally, state agency psychological consultants, Michael Maliszewski, Ph.D., and Mary O'Brien, Ph.D., each completed reports contained in the record. Because Plaintiff only asserts errors in the ALJ's assessment of evidence related to his physical, and not mental, conditions, the Court will not summarize Dr. Maliszewski's Psychiatric Review Technique, r. 354, or Dr. O'Brien's Mental Status Report, r. 345. Dr. Maliszewski also completed a Mental Residual Functioning Capacity Assessment

Dr. Todd conducted a physical evaluation of Plaintiff on March 24, 2010. R. 377. Dr. Todd reported that Plaintiff could walk for one mile, lift 40 pounds with his right hand, and lift 30 pounds with his left hand. R. 373-74. Dr. Todd's report states that Plaintiff had a "clearly frozen shoulder" which only elevated to 90 degrees before pain developed. R. 374. Plaintiff also reported pain in his right big toe. Id. Dr. Todd observed "good power and strength" in Plaintiff's hands and a normal ability to manipulate fine objects. Id. Dr. Todd's report does not address Plaintiff's back pain, and back pain is absent from Plaintiff's listed impairments to be addressed. R. 377 (listing "foot pain, stomach, bipolar, nervous d/o, PTSD, torn rotor cuff [sic], shaky hands, irregular heartbeat, tremor, liver psorosis, near sightedness" as Plaintiff's "impairments of record").

Dr. Straub's assessment, dated April 1, 2010 and based on review of records but not an independent examination of Plaintiff, lists "frozen shoulder" as Plaintiff's primary diagnosis. R. 381. Dr. Straub described Ross's conditions and made the following conclusions about his limitations, based on his review of the record: Ross could (1) occasionally lift or carry 20 pounds; (2) frequently lift or carry 10 pounds; (3)

---

of Plaintiff. R. 368. While Plaintiff does not assert errors in the ALJ's consideration of this Assessment, he does assert error in the communication of the Assessment's results to the vocational expert. See infra Part V.C.

stand or walk for a total of six hours in an eight-hour workday;
(4) sit for a total of six hours in an eight-hour workday; and
(5) reach in directions to a limited degree on his left side, to
90 degrees. R. 382-84. Dr. Straub found that Plaintiff otherwise
exhibited no limitations in his residual functioning. Dr. Straub
marked that there were no medical source statements regarding the
claimant's physical capacities in his file. R. 387.

The ALJ summarized these opinions and relied on them in his
decision. R. 30; r. 36. As the ALJ summarized it, "the medical
consultants determined that [the claimant] was able to engage in
light exertion that does not require lifting his arm above ninety
degrees." R. 30.

## C. Treating Physician Evaluations

Plaintiff provided three completed questionnaires from
treating physicians, two from Dr. Jack and one from Dr. Tannoury.

Dr. Tannoury completed a lower extremities impairment
questionnaire date June 1, 2011, reporting that he had treated
Plaintiff for his degenerative disc disease since March 16, 2011.
R. 661. Plaintiff's treatment regime consisted of ibuprofen,
cortisone injections, and physical therapy. R. 665-66. The
questionnaire asserted that Plaintiff "periodically" experienced
pain severe enough to interfere with his attention and
concentration. R. 666. Dr. Tannoury reported that Ross could sit
for a total of four hours in an eight-hour workday, and stand or

9

walk only zero to one hour during the day. R. 664. He stated that Ross could frequently lift or carry five to ten pounds. R. 665.

Dr. Jack submitted two multiple impairment questionnaires, one dated March 31, 2011, and the other dated June 2, 2011. Each identifies lower back pain, "constant" and "sharp and radiating to leg," as Plaintiff's main symptom. R. 548-49; r. 692-93. In March, Dr. Jack estimated Plaintiff's pain level as a 5 ("moderate") and in June as a 7 ("moderately severe"). Dr. Jack asserted in March that Plaintiff "periodically" experienced pain severe enough to interfere with his attention and concentration, but raised the level to "frequently" in June. R. 552; r. 696. In March, Dr. Jack reported that Ross could sit for only zero to one hour during an eight-hour workday; in June, he increased his estimation to three to four hours in an eight-hour workday. R. 549; r. 693. In both assessments, Dr. Jack reported that Ross could stand or walk only zero to one hour during a typical workday. Id.

The ALJ summarized these opinions and relied on them in his decision. R. 32-35. The ALJ found that these functional capacity evaluations presented "significant exertional and non-exertional limitations that would preclude all work in the competitive economy." R. 35. Nevertheless, the ALJ concluded that the opinions expressed in the questionnaires were inconsistent with the objective medical findings. Id.

### III. STANDARD

### A. Statutory and Regulatory Framework

Plaintiff brings his action to review the Commissioner's final decision denying his claims for SSDI and SSI under sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3). Under the Act, a claimant seeking benefits must prove that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To meet this definition, a person must have a severe impairment that renders him unable to do his past relevant work or any other substantial gainful work that exists in the economy. 20 C.F.R. § 416.905(a).

The Commissioner has developed a five-step sequential evaluation process to assess a claim for disability benefits. See 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1509; see also Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982). The evaluation may be concluded at any step in the process if it is determined that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4). The steps are as follows: (1) if the claimant is engaged in substantial gainful work activity, the application is denied; (2) if the claimant does not have, or has not had within the relevant time period, a severe impairment or

combination of impairments, the application is denied; if the claimant has a severe impairment, the analysis proceeds to the next step; (3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; (4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; and (5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted. Goodermote, 690 F.2d at 6-7; Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). A claimant's "impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [he] can do in a work setting." Id. A claimant can adjust to other work if he can do any jobs that "exist in significant numbers in the national economy." Id.; § 404.1560(c)(1).

The claimant bears the burden of proof on steps one through four. At step five, the SSA bears the burden of proof of coming forward with evidence of specific jobs in the national economy that the applicant can still perform. Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

**B. Standard of Review**

This Court's authority to review an ALJ's decision is limited: the Court may only set aside the decision if it resulted from legal error or if the ALJ's factual findings were not supported by substantial evidence. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The Court must uphold the ALJ's determination "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriquez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence exists "if a reasonable mind reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion." Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). In determining the requisite quantity and quality of the evidence, the Court will examine the record as a whole. Rohrberg v. Apfel, 26 F. Supp. 2d 303, 306 (D. Mass. 1998).

In addition to considering whether the ALJ's decision was supported by substantial evidence, a court must consider whether the proper legal standard was applied. "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922

F. Supp. 689, 694 (D. Mass. 1996) (citing <u>Wiggins v. Schweiker</u>, 679 F.2d 1387, 1389 (11th Cir. 1982)).

## IV. PROCEDURAL HISTORY

Plaintiff filed his SSDI and SSI applications on June 24, 2009, alleging a disability onset date of May 31, 2008. His applications were denied on August 25, 2009, and again upon reconsideration on April 9, 2010. On June 11, 2010, Plaintiff filed a request for an administrative hearing. The hearing was held before ALJ J. Alan Mackay on June 13, 2011. Plaintiff, who was represented by counsel, r. 27, appeared and testified at the hearing, r. 46-57.

On July 14, 2011, the ALJ issued his decision. R. 24-41. At step one, the ALJ found that Mr. Ross had not engaged in substantial gainful activity since May 31, 2008, the alleged onset date. R. 30. At step two, the ALJ found that Mr. Ross suffered from the following severe impairments: degenerative disc/joint disease, cirrhosis, depression, and substance abuse. R. 30-32. At step three, he found that Mr. Ross did not have an impairment or combination of impairments that met or medically equaled the statutory definition of a disability under 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 32-34. Next, the ALJ assessed Mr. Ross's RFC and found that Plaintiff possessed the capacity to perform light work "that does not require lifting his left arm

above ninety degrees." R. 34. Additionally, the ALJ found that
Mr. Ross had moderate limitations which would impact his ability
to perform work, including limitations on the ability to complete
a normal work tour, interact with the public, keep to a schedule,
understand, respond to shifts in the work environment, remember
and carry out instructions, and maintain attention. Id. Although
two treating physicians completed functional capacity evaluations
and reported that Mr. Ross's impairments would "preclude all work
in the competitive economy," the ALJ found the doctors'
evaluations "inconsistent with their own physician exam
findings." R. 35.

Based on Plaintiff's RFC, the ALJ found at step four that
Mr. Ross was unable to perform any of his past work as an
electrician and hazardous materials technician. R. 36. At step
five, the ALJ found that Mr. Ross would be capable of performing
certain other jobs that exist in significant numbers in the
national economy, including store attendant, electrical acessory
assembler, and finishing inspector. R. 37. Thus, the ALJ found
that Mr. Ross was not disabled under the Act.

Mr. Ross requested review of the ALJ's decision on August
11, 2011. On December 18, 2012, the Social Security
Administration Appeals Council issued its decision denying Mr.
Ross's request for review of his SSDI and SSI claims. After SSA
granted an extension of time for Mr. Ross to file a civil action,

he filed this action on May 2, 2013. The entire case is now ripe for review under 42 U.S.C. § 405(g).

## V. DISCUSSION

### A. Weight of the Treating Physicians' Opinions

The key issue is whether the ALJ gave sufficient weight to the opinions of Plaintiff's treating physicians. Ross asserts that the ALJ failed to provide good reasons for rejecting the opinions of Dr. Jack and Dr. Tannoury, and instead improperly relied on the opinions of the non-treating state agency medical consultants. In his decision, the ALJ noted that Dr. Jack and Dr. Tannoury's completed functional capacity evaluations, if credited, indicated that Ross's limitations would preclude all work in the competitive economy. R. 35. Both Drs. Jack and Tannoury opined that Ross can sit for only four hours of a workday, making even sedentary work difficult for him. See 20 C.F.R. § 404.1567(a) (defining sedentary work); 20 C.F.R. § 416.967(a) (same); SSR 83-10 (defining sedentary work as including periods of sitting six hours of an eight-hour workday); SSR 96-9p (in a sedentary work setting, "[s]itting would generally total about 6 hours of an 8-hour workday"). The ALJ afforded these evaluations less weight because he found them "inconsistent with [the doctors'] own physical exam findings." R. 35. After discussing the discrepancies he saw between the medical

16

record and Dr. Jack's and Dr. Tannoury's assessments, the ALJ found that the record evidence supported the opinions of the state agency consultants. R. 36.

A treating source is defined by 20 C.F.R. §§ 404.1502, 416.902 as a patient's own physician, psychologist, or other acceptable medical source who has provided medical treatment in an ongoing way. A treatment provider's opinion is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); see also Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002). However, the ALJ is not "obligated automatically to accept" the treating physicians' opinions. Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass 1998); Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 271, 276 (1st Cir. 1991) ("The law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians."). When a treating source's opinion is not given controlling weight, the ALJ must determine the amount of weight to give the opinion based on factors that include the length of the treatment relationship, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source is a specialist. 20 C.F.R. § 404.1527(c). The ALJ must give "good

17

reasons" for the weight he ultimately assigns to a treating source's opinion. <u>Id.</u> at § 404.1527(c)(2).

Under the regulations, several factors weigh in favor of giving controlling weight to Plaintiff's treating physicians. First, there are two of them who agree. Second, one of them is an orthopedic specialist, and the other served as Plaintiff's primary care physician for years. The regulations direct ALJs to "generally give more weight to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Tannoury is a specialist in orthopaedic issues and minimally invasive spine surgery, according his opinion of Plaintiff's back pain great weight. A physician with few opportunities to examine a patient warrants less deference than a physician who has a more longstanding relationship with a patient. 20 C.F.R. § 404.1527(c)(2)(i); <u>Arruda v. Barnhart</u>, 314 F. Supp. 2d 52, 72, 75 n.20 (D. Mass. 2004). Here, Dr. Tannoury met with Plaintiff multiple times, beginning in March 2011, and Dr. Jack acted as Plaintiff's primary case physician since 2010.

Third, reliance on a non-treating, consulting examiner's opinion is disfavored where the consultant does not have an expert report in the record. <u>Rosario v. Apfel</u>, 85 F. Supp. 2d 62, 68 (D. Mass. 2000); SSR 96-6p (observing that the opinions of state agency consultants may be given greater weight when the

18

"consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source"). The consultant reports did not discuss Plaintiff's back condition and were temporally removed from the ALJ's decision by more than a year. Dr. Straub never examined Plaintiff, and instead reviewed his claim file as of April 2010. Dr. Todd examined him in March 2010, a year before Plaintiff began seeing Dr. Tannoury to address his back pain, and months before Plaintiff's December 2010 rotator cuff surgery. Dr. Todd's report does not list "back pain" as one of Plaintiff's "impairments of record." R. 377. Neither Dr. Todd nor Dr. Straub was privy to the results of the MRI of Plaintiff's back, performed in March 2011, r. 540-41, and referenced in Dr. Jack's and Dr. Tannoury's assessments, r. 548; r. 662; r. 692. Thus, the non-treating consultants reviewed only a partial record, missing a thorough examination of Plaintiff's back pain, while the treating physician opinions were based on more updated (and thus more detailed and comprehensive) information.

Fourth, while the ALJ explained that he gave less weight to the treating physicians' opinions due to his perceived inconsistencies with the medical record as a whole, he did not thoroughly explain why the agency consultants should be granted

greater weight. Instead, he provided only a conclusory statement explaining why he granted greater weight to the opinion of the state-agency medical consultants, stating only in general terms that the objective medical record supported their opinions. R. 36; cf. SSR 96-6p (noting that ALJs "must explain the weight given to the [state agency consultant's] opinions in their decisions").

Still, the ALJ has a fair point when he states that the record as a whole does not support a disabling back injury dating back to May 2008. Indeed, when Ross applied for disability benefits he did not even list a disabling back injury among his ailments. The physical exam reports focused primarily on Plaintiff's shoulder problems. Concluding that Plaintiff's rotator cuff issues did not support a finding of disability, the ALJ observed that the records detailed 5/5 muscle strength, normal levels of strength, sensation, and reflexes, and no mention of any limitation on Ross's ability to use his right arm. Id.; r. 248 (medical record dated 7/23/08, detailing examination of left arm in response to Plaintiff's complaint of "left shoulder dislocations"); r. 413-16 (medical record dated 4/8/09, detailing Plaintiff's report of pain in left shoulder); r. 425-27 (medical record dated 6/2/10, Plaintiff's left shoulder "diong [sic] better but still not normal" despite physical therapy; "hands with 5/5 strength"). Physical examinations indicated a

limited ability to elevate his left arm above shoulder level, but the ALJ found that the medical records evidenced no limitation on Ross's ability to reach, grasp, and twist objects below shoulder-level. R. 35; r. 374 (consultative examination report dated 3/27/10, noting frozen left shoulder, but noting Plaintiff's ability to "manipulate fine objects" with his hands); r. 477 (physical examination by Dr. Jack dated 9/30/10, noting inability to "abduct high [sic] than level of shoulder," but "good int [sic] and ext [sic] rotation"); r. 657 (medical record dated 4/29/11; following left rotator cuff repair surgery, patient reports "minimal pain" and exhibits "forward flexion of 100 degrees and abduction at 90 degrees").

Though both Dr. Jack's and Dr. Tannoury's assessments reported severe limitations in Ross's ability to sit or stand during a normal work day, the ALJ concluded that references to prescribed limitations in sitting, standing, or walking were absent from their treatment notes. The Court notes, however, that Plaintiff's medical record does reference some difficulties with walking and standing. E.g., r. 531-33 (patient experiencing "residual pain with walking" from bunion treatment and back pain, but noting patient's "normal mobility"); r. 542-43 (patient's back pain "made worse with prolonged walking and standing" but gait "normal"). Plaintiff's "treatment prescribed in the record calls for intensive physical therapy," r. 35, as the ALJ

21

concluded, but Dr. Tannoury also gave him cortisone injections to address his back pain. R. 666. The dearth of information about Plaintiff's back injury is not so surprising, since he did not slip and fall and hurt his back until 2011. That year, an orthopedic surgeon read the MRI and opined that Plaintiff's degenerative disc disease prevented him from sitting more than four hours and standing more than one hour in a typical eight-hour workday. The ALJ lacks the expertise to read this MRI, and there is no indication that the medical consultants had the opportunity to consider it, since they reviewed his record a year prior, in 2010.

In sum, the ALJ's decision granted greater weight to the reports of non-treating physicians (only one of whom actually examined Plaintiff, and both completed more than a year prior to the hearing) than to the reports of Plaintiff's treating physicians (one of whom was an orthopaedic specialist, and both based on Plaintiff's updated medical conditions). This is in error, particularly where neither Dr. Todd nor Dr. Straub discussed Plaintiff's back pain or had the opportunity to update their reports based on Dr. Tannoury's spring 2011 diagnosis of degenerative disc disease. The Court concludes that there is not substantial evidence in the record to support the ALJ's finding that certain treating source evaluations were inconsistent with the record as a whole and thus entitled to less weight than the

state agency medical consultants' reports. In light of the inadequate weight granted to the treating physicians' opinions, the Court remands.

## B. Other Arguments

Ross asserts two other arguments in his motion for judgment on the pleadings. Because the Court will remand the case for proper consideration of Plaintiff's treating physicians' opinions, the Court will address his two remaining arguments only briefly here.

First, Ross asserts that the ALJ failed to properly evaluate his credibility. The ALJ concluded that despite the sincerity of Ross's testimony, "Given the objective findings and the claimant [sic] description of daily activities, [I] do not find that his testimony is sufficient to establish a level of limitations" beyond that described in the residual functioning capacity assessment. R. 34-35. Determining issues of credibility and drawing inferences from the record evidence sit squarely in the province of the ALJ. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). That said, a court may review the record to assess whether the ALJ properly considered the factors set forth in Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986) (directing the ALJ to "investigate all avenues presented that relate to subjective claimants," including, inter alia, "type, dosage, effectiveness, and adverse

side-effects of any pain medication," "treatment, other than
medication, for relief of pain," the claimant's functional
restrictions, and the claimant's daily activities). This issue is
now moot. On remand, the ALJ should offer Ross the opportunity to
present updated testimony and consider the his updated medical
records and the updated reports of Ross's treating physicians in
his evaluation of Ross's credibility.

Second, Plaintiff asserts that the ALJ relied on flawed
testimony from the vocational expert, arguing that the
hypothetical presented to her omitted certain limitations present
in the ALJ's RFC finding.[5] "[I]n order for a vocational expert's

_____

[5] The ALJ posited the following hypothetical to the
vocational expert, Jeffrey Goldfarb:

> Please consider a hypothetical individual whose age
> ranges from 43 to 46, with a high school education, the
> same training and work experience as Mr. Ross,
> exertional impairments, which limit him to the light
> exertional level. And now, I want to make reference to
> the RFCs that were done for the DDS at 10F and 7F. . .
> . The evaluator who did the physical RFC assessment
> says that Mr. Ross's ability to reach is limited on the
> left to 90 degrees, but he has good strength. . . . I
> want to read to you the functional capacity assessment
> from 7F. The evaluator says that he is capable of
> recall for simply tasks; his attention is intact
> sufficiently to perform simple tasks; basic social
> skills appear intact; claimant's mood would not prevent
> him from performing concrete tasks in a normal
> structured work setting.

R. 58-59 (reading from Mental Residual Functional Capacity
Assessment, r. 370). The vocational expert opined that while
Ross's prior work would be precluded by these limitations, such a
person could perform light and unskilled work, for example as a
store attendant, assembler of electrical accessories, or finish

answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." <u>Arocho</u>, 670 F.2d at 375. The "moderate limitations" found by the ALJ in his decision are each contained in the "summary conclusions" section of the Mental Residual Functional Capacity Assessment, exhibit 7F; the ALJ's report even lifts the same phrasing. <u>Compare</u> r. 34 (ALJ decision), <u>with</u> r. 368-69 (Mental Residual Functional Capacity Assessment, Part I: Summary Conclusions). The vocational expert reviewed exhibit 7F prior to the hearing, r. 58, and the ALJ referred the vocational expert to exhibit 7F while posing the hypothetical, r. 59. In his hypothetical, the ALJ read from the portion of exhibit 7F, wherein the medical consultant is directed to "[e]xplain your summary conclusions in narrative form." R. 370. Therefore, the hypothetical posed to the vocational expert incorporated and referenced the ALJ's findings, qualifying the vocational expert's opinion as substantial evidence that Ross is able to perform work in the national economy. <u>Cf.</u> <u>Espada-Rosado v. Comm'r of Soc. Sec.</u>, 25 Fed. Appx. 5, 6 (1st Cir. 2001) (per curiam). There was no error.

---

inspector. R. 59-60. Based on this response, the ALJ concluded that Ross has the residual functioning capacity to perform these types of jobs. R. 36-37.

## VI. ORDER

The Court **DENIES** in part and **GRANTS** in part Plaintiff's Motion for Judgment on the Pleadings (Docket No. 11). The Court **GRANTS** in part and **DENIES** in part Defendant's Motion to Affirm the Commissioner's Decision (Docket No. 17). The case is **REMANDED**.


     /s/ PATTI B. SARIS
    Patti B. Saris
    Chief United States District Judge